UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re:

TIMOTHY P. GARDNER,                                    Chapter 7
                                                       Case No.: 03-13874

                              Debtor.
_____

HARDGATE LIMITED,                                      Adv. No.: 04-90152

                              Plaintiff,

        v.

TIMOTHY P. GARDNER,

                              Defendant.
_____

APPEARANCES:

O'Connor, O'Connor, Bresee & First, P.C.               Michael J. O'Connor, Esq.
*Attorneys for the Debtor/Defendant*
20 Corporate Woods Blvd.
Albany, New York 12211

The Law Office of John T. Keenan, III                  John T. Keenan, III, Esq.
*Attorneys for the Plaintiff*
600 Broadway, 3rd Floor
Albany, New York 12207

Bond, Schoeneck & King, PLLC                           Arthur J. Siegel, Esq.
*Attorneys for (Plaintiff's) Witness Frank C. Mayer, Esq.*
111 Washington Avenue
Albany, NY 12210-2211

Hon. Robert E. Littlefield, Jr., United States Bankruptcy Judge

### MEMORANDUM-DECISION AND ORDER

        Plaintiff, Hardgate Limited ("Hardgate"), commenced the above-captioned adversary

proceeding against Timothy P. Gardner (the "Debtor") on June 18, 2004, by filing a complaint (the

"Complaint") seeking to except a certain debt from discharge pursuant to 11 U.S.C. § 523, as well

as to deny the Debtor's discharge pursuant to 11 U.S.C. § 727.[1]  Though the Complaint fails to

identify each specific subsection under which relief is sought, the record fleshes out Hardgate's

causes of action as ones under §§ 523(a)(2)(B) (false financial statement), 727(a)(2)(A) (fraudulent

transfer of property), (a)(3) (failure to keep or preserve financial records), and (a)(5) (failure to

satisfactorily explain loss of assets).[2]  In addition to these four counts, the court's February 8, 2005

Order to Show Cause is now ripe for adjudication.  (Dkt. No. 21.)  Its purpose, among other things,

is to discern whether Hardgate or its present counsel, John T. Keenan, III, Esq., must be sanctioned

pursuant to Federal Rule of Civil Procedure 45(c)(1) for failing to take reasonable steps to avoid

imposing undue burden or expense on Frank C. Mayer, Esq., Hardgate's former counsel, whom it

subpoenaed to appear as a fact witness at the trial in this proceeding.[3]

### JURISDICTION

The court has jurisdiction over the parties and subject matter of this core proceeding pursuant

to 28 U.S.C. §§ 157(a), (b)(1), (b)(2)(I), (J), and 1334(b).

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code (the "Bankruptcy Code").

[2] The body of the three-page Complaint references only §§ 523(a)(2) and 727(a); the wherefore clause, however, specifies § 727(a)(2), (3), and (5).  Since the Debtor did not object to the Complaint on grounds of failure to abide by general federal pleading requirements, *see* FED. R. CIV. P. 8; FED. R. BANKR. P. 7008 (Rule 8 applies in adversary proceedings), or lack of specificity, *see* FED. R. CIV. P. 9; FED. R. BANKR. P. 7009 (Rule 9 applies in adversary proceedings), the court will treat the Complaint as if it were properly pleaded and, thus, adjudicate the four causes of action referenced above.

[3] The Order to Show Cause was presented to the court by Arthur J. Siegel, Esq., counsel for Attorney Mayer, who sought therein to quash the subpoena issued to his client by Attorney Keenan.  That began a lengthy dispute whether the attorney-client privilege excused Attorney Mayer's compliance with the subpoena ad testificandum, but that question was answered by the court's bench ruling allowing Attorney Mayer's testimony at trial on February 14, 2005.  In an effort to clarify the record, however, the court will expound upon its bench rulings on this and certain other evidentiary points made during the prolonged litigation of this case.

## THE PREPETITION STATE COURT ACTION

The acrimonious relationship between the Debtor and Hardgate has been the subject of a prior state court lawsuit; the outcome of that lawsuit likely precipitated the Debtor's bankruptcy filing here.  Except where noted, the court simply reiterates the findings of the December 10, 2002 Decision and Order issued by the Honorable Louis C. Benza, Albany County Supreme Court, Index No. 5890-02 (the "State Court Action").  (Def.'s Ex. B.)

In May 2002, the Debtor was contacted by Iftikhar Dean ("Dean") about an investment opportunity with Dean's company, United Holdings, LLC ("United").  According to Dean, United, a New York limited liability company with a principal place of business in Loudonville, New York, planned to purchase from Hardgate, a foreign corporation with a principal place of business in Nassau, Bahamas, its interest in American Glove Corporation ("American Glove"), a Delaware corporation with a principal place of business in Amsterdam, New York (the "American Glove Transaction").  (*See* Oct. 15, 2002 Aff. of Timothy Gardner and Frank Callucci ¶ 3, Pl.'s Ex. A.) In what later proved to be poor business judgment, the Debtor, along with an acquaintance, Frank Callucci ("Callucci"), invested considerable sums in United.  On June 27, 2002, United executed a Promissory Note (the "Note") in favor of Hardgate in the amount of $175,000.  (Pl.'s Ex. C.) Payment of the Note was secured by personal guarantees of the Debtor, Callucci, and Dean.  Such guarantees were required pursuant to a Stock Purchase Agreement and Pledge Agreement executed on the same day as the Note.  (*Id.*)  The guarantees of the Debtor and Callucci, however, were to be released once United established a standby letter of credit in favor of Hardgate.  When United failed to make timely payment and establish the requisite line of credit, Hardgate notified United of its default.  While the Pledge Agreement provided that United pledged the stock of American Glove

as collateral for the loan, the Note allowed Hardgate, at its option, to exercise all of its rights against United and against the collateral.

On August 26, 2002, Hardgate commenced suit and sought expedited relief against United, Dean, the Debtor, and Callucci to recover payment in the principal sum of $175,000. United and Dean defaulted in appearance. The Debtor and Callucci, on the other hand, answered and asserted counterclaims and cross-claims for fraud in the inducement. After having determined that their defenses, counterclaims, and cross-claims were fruitless, Judge Benza granted Hardgate's motion for summary judgment in lieu of complaint as against all defendants. Accordingly, on January 29, 2003, the Albany County Clerk entered judgment, jointly and severally, against United, Dean, the Debtor, and Callucci for a total of $183,883.75 (the "Judgment"). (Def.'s Ex. C.)

## THE ADVERSARY PLEADINGS

Hardgate's first claim alleges that the Debtor "prepared or caused to be made, . . . executed and published" (Compl. ¶¶ 6, 8) a materially false personal financial statement to entice Hardgate to extend credit to United. Hardgate insists that the Debtor was required to disclose his financial condition as part of the American Glove Transaction prior to his execution of the Note. On June 6, 2002, the Debtor prepared a Personal Financial Statement (the "Statement") (Pl.'s Ex. D), which Hardgate claims to have relied upon to its detriment. The Statement included the following entries: cash – $7,200; IRA or Other Retirement Account – $4,100; Accounts and Notes Receivable – $215,000; Real Estate – $165,000; Salary – $119,000; and Real Estate Income – $12,000. (*Id.*) According to Hardgate, the Statement contained several material misrepresentations, including: fabrication or gross overstatement of accounts and notes receivable; an inflated real estate value; an inflated gross salary; inaccurate rental income; and failure to disclose that a parcel of income

4

property was under contract for a sale price well below its fair market value. (Compl. ¶ 7.) The first

claim, therefore, seeks judgment to except the Judgment debt owed to Hardgate from discharge

pursuant to § 523(a)(2)(B).

Hardgate's second claim alleges that the Debtor, with intent to hinder, delay, or defraud his

creditors, transferred his interest in real property located in Troy, New York (the "Troy Property"),

and certain personal property, including cash, antique furniture, and jewelry, within one year before

the date of the filing of his bankruptcy petition. (*Id.* ¶ 11.) Thus, the second claim seeks judgment

barring the Debtor's discharge pursuant to § 727(a)(2)(A).

Hardgate's third claim alleges that the Debtor concealed, destroyed, falsified, or failed to

keep or preserve any recorded information, including books, documents, records, and papers, from

which his financial condition might be ascertained. (*Id.* ¶ 12.) As a result, Hardgate's third claim

seeks judgment barring the Debtor's discharge pursuant to § 727(a)(3).

Finally, Hardgate's fourth claim alleges that the Debtor failed to satisfactorily explain the

loss of significant assets, including antique furniture and jewelry listed on the Statement. (*Id.* ¶ 13.)

Hardgate contends that such conduct warrants the denial of discharge pursuant to § 727(a)(5).

In his Answer, the Debtor denies any wrongdoing. Rather, the Debtor declares that he was

victimized by Dean and Hardgate because his investment of $215,000 has proven to be worthless.

Specifically, however, the Debtor sets forth six affirmative defenses.

First, the Debtor states that the Complaint fails to state a cause of action for which relief can

be granted. (Answer ¶ 7.)

Second, the Debtor states that he was never asked by Hardgate, American Glove, or any of

their representatives for personal financial information. (*Id.* ¶¶ 11–15.) Rather, Dean asked the

5

Debtor to provide him with the Statement on the premise that Hudson River Bank and Trust Company ("Hudson River") required investors' statements because Hardgate was assigning to United a line of credit with Hudson River. (*Id.* ¶ 10.) After he provided the Statement to Dean, the Debtor learned that Hudson River had never authorized the sale of assets by American Glove. The Debtor, therefore, avers that Hardgate and American Glove sought to fraudulently sell assets without the consent of the secured creditor. The Debtor also states that the request for him to sign the guaranty came directly from Dean; at Dean's urging, the Debtor went to the offices of Hardgate's attorney and signed the Note. (*Id.* ¶¶ 24, 28.) He received no consideration for his guaranty, but was nonetheless compelled to comply with Dean's directives because he had invested $215,000 for what he believed to be a legitimate asset acquisition by United. (*Id.* ¶ 25.) Further, the Debtor contends that he was unaware that Dean shared the Statement with Hardgate, American Glove, or any of their representatives. (*Id.* ¶ 29.) The Debtor challenges each element of fraud by denying that he ever made or published material misrepresentations upon which Hardgate could reasonably have relied. (*Id.* ¶ 34.)

Third, the Debtor admits that he transferred both real and personal property listed on the Statement prior to filing for bankruptcy relief, but he denies having done so with fraudulent intent. With respect to the personal property, the Debtor explains that all furniture and jewelry was delivered to Dean in June 2003, who purportedly liquidated the assets to raise money for payroll to meet United's trust fund obligations and employee salaries. (*Id.* ¶ 39.) While Dean advised the Debtor that the items had been sold, he never provided the Debtor with either the identity of the purchaser or a breakdown or accounting of the funds received. (*Id.* ¶ 40.) With respect to the Troy Property, the Debtor clarifies that he owned the income property jointly with Roberto Mantello

("Mantello").  When he and Mantello experienced difficulties managing the Troy Property, they decided to enlist Timothy Eakin ("Eakin"), who at the time was not a licensed realtor, to sell it.  The Debtor was advised that a purchaser had been found and he agreed to sell the Troy Property with the understanding that any consideration would be sufficient to pay off the secured debt and allow him to net approximately $1,000.  The Debtor was not represented by counsel in connection with the sale, and he transferred the Troy Property to Eakin.  The Debtor subsequently learned that Eakin then transferred the Troy Property to Charlie Smith ("Smith").  The Debtor was not involved in the second transaction.  (*Id.* ¶ 43.)

Fourth, the Debtor avers that his financial record keeping is consistent with his level of sophistication, as determined by his occupation, financial structure, education, experience, and overall business acumen.  (*Id.* ¶ 45.)

The Debtor's fifth affirmative defense mirrors his fourth, except that he asks for counsel fees and costs relative to his defense of this adversary proceeding.

Sixth, the Debtor asserts that, because of the State Court Action and Judgment, Hardgate is collaterally estopped or, alternatively, barred by res judicata from seeking any relief based upon fraud.  (*Id.* ¶ 50.)

**FACTUAL AND PROCEDURAL BACKGROUND**

The Debtor filed a Voluntary Petition, together with the requisite schedules and Statement of Financial Affairs, and Chapter 13 Plan on June 5, 2003.  (Case No. 03-13874 (the "Main Case"), Dkt. No. 1.)  On Schedule F, the Debtor lists Hardgate as a judgment creditor due $183,884, and he also lists United, Dean, and Callucci for notification purposes only.[4]  The Debtor's Schedule F total

---

[4] The court takes judicial notice of the prior bankruptcy filings of Dean and Callucci.  *See* FED. R. EVID. 201.  Dean, under the name of Iftokhar L. Din, a/k/a Iftokhar L. Dean, filed a Voluntary Petition for

is $196,837; thus, the debt owed to Hardgate comprises approximately 93% of the general unsecured

debt in the case.  The Debtor discloses the State Court Action under Question 4 of the Statement of

Financial Affairs.  Under Question 10 of the Statement of Financial Affairs, the Debtor discloses the

June 2002 sale of the Troy Property, with the notation that the $45,000 proceeds were used to satisfy

a mortgage in the same amount with the Troy Savings Bank.

On Amended Schedule I, the Debtor lists his occupation as a Data Base Administrator, and

he also lists a second job at Price Chopper; he lists gross monthly income of $4,215.22.  (Main Case,

Dkt. No. 15.)  Amended Schedule J computes his total monthly expenditures to be $3,345.  (*Id*.)  The

Debtor's initial Chapter 13 Plan proposed a dividend of $19,683.93, or 10%, to general unsecured

creditors.  (Main Case, Dkt. No. 2.)  On September 5, 2003, following an objection to confirmation

of the plan by the Chapter 13 Standing Trustee, Andrea E. Celli, Esq. (Main Case, Dkt. No. 12), the

Debtor filed an Amended Chapter 13 Plan (the "Amended Plan") that increases the minimum

dividend to unsecured creditors to 20% (Def.'s Ex. J), and an Amended Schedule B (Main Case,

Dkt. No. 14).  Under paragraph 33 of the Amended Schedule B, the Debtor lists a "$215,000 Note

Receivable [the "Note Receivable"] against United," with a notation that an unnamed litigation

attorney had advised that the Note Receivable was uncollectible, but that any money received would

---

Chapter 13 relief on October 20, 2003, under Case No. 03-16972.  Hardgate was listed as a judgment
creditor on Schedule F, though the amount of the debt was erroneously scheduled as $18,300.  The docket
report shows that, upon motion of the Chapter 13 Standing Trustee, the case was dismissed by Order
dated March 9, 2004, and subsequently closed on November 24, 2004.  Callucci filed a Voluntary Petition
for Chapter 7 relief on August 21, 1998, under Case No. 98-15585.  He received a discharge in that case
on January 7, 1999.  On May 28, 2003, Callucci filed a second Voluntary Petition, but for Chapter 13
relief under Case No. 03-13643.  He listed Hardgate as a judgment creditor on Schedule F, indicating the
Judgment indebtedness in the amount of $183,883.75.  Bearing striking similarity to the Debtor's case,
the Judgment represented Callucci's largest unsecured debt and comprised only a fraction less than 100%
of his Schedule F total.  Hardgate objected to confirmation of the proposed plan in that case, and moved
to dismiss the case with prejudice.  Ultimately, Callucci sought voluntary dismissal; on March 8, 2004,
the court issued an order granting Callucci's request and dismissing the case without prejudice.
Callucci's case was closed on May 20, 2004.

be funded into the Amended Plan.  (*Id.*)

By Order dated September 23, 2003, confirmation of the Amended Plan was denied.  (Main Case, Dkt. No. 21.)  On September 18, 2003, Hardgate filed a motion to dismiss the Debtor's case with prejudice and an objection to the Debtor's claimed exemptions.  (Main Case, Dkt. Nos. 17 and 19.)  The former motion was subsequently withdrawn by letter dated November 17, 2003.  (Main Case, Dkt. No. 39.)  However, Hardgate filed a second motion to dismiss the case with prejudice on January 28, 2004.  (Main Case, Dkt. No. 44.)  On March 8, 2004, the Debtor sought to convert the case from one under Chapter 13 to one under Chapter 7.  (Main Case, Dkt. No. 50.)  The case was subsequently converted on March 9, 2004.  The § 341 Meeting of Creditors was held and closed on April 21, 2004.  On July 29, 2004, after the filing of the Complaint, the court erroneously issued the Debtor's discharge.  (Main Case, Dkt. No. 77.)  The error was corrected, however, by the court's August 6, 2004 order vacating the Discharge Order.  (Main Case, Dkt. No. 79.)

This adversary proceeding was commenced within the allowed time frame, but prosecution of the Complaint has left much to be desired.  Several preliminary matters diverted the parties and the court's attention from the merits of the Complaint, including violations of the court's August 9, 2004 Scheduling Order (Dkt. No. 8.), objections to proffered exhibits, and the controversy over Hardgate's designation of Attorney Mayer as one of its principal witnesses.

Pursuant to the Scheduling Order, the trial in this case was set for February 14, 2004.  The parties were directed to (1) complete all discovery on or before October 8, 2004; (2) file and serve all motions on or before December 9, 2004; (3) cooperate in preparing and filing a joint stipulation of facts on or before February 4, 2005; (4) file and serve pretrial statements and exhibits on or before February 4, 2005; and (5) file written objections, if any, to all exhibits and all witnesses listed in the

opponent's pretrial statement on or before February 9, 2005.

On September 8, 2004, the Debtor filed two discovery motions: the first, requesting an order directing the 2004 examination, *see* FED. R. BANKR. P. 2004, of Robert Nihon ("Nihon"), a principal of Hardgate (Dkt. No. 9); and the second, requesting an order compelling the production of documents by Hudson River (Dkt. No. 11). The court granted the first motion at a September 23, 2004 hearing, and the parties were directed to settle an order. The order, however, was not entered until November 9, 2004, well after the discovery deadline expired. (Dkt. No. 16.) With respect to the Hudson River motion, the parties advised the court at an October 21, 2004 hearing that it too had been settled, and they were again directed to settle an order. That order was also entered on November 9, 2004. (Dkt. No. 17.) The court subsequently learned at trial that the Debtor was never able to depose a representative of Hardgate because all representatives of the corporation are foreign citizens outside of this court's jurisdiction. While the Plaintiff made certain information requests in the Debtor's main case (*see* Pl.'s Ex. E), it did not conduct any discovery in this adversary proceeding.

Despite the Scheduling Order's cautionary notice that failure to comply with its terms may result in dismissal or appropriate sanctions, preclusion, the striking of pleadings, or the entry of an order or judgment accordingly, Hardgate missed the February 4, 2005 deadline for filing its pretrial statement; it did not file the same until February 9, 2005. (Dkt. No. 20.) Further, Hardgate's pretrial statement did not list its proposed exhibits; rather, it indicated that counsel would file copies of plaintiff's exhibits with the clerk in hard copy form.[5]

_____

[5] On September 22, 2004, the Clerk's Office issued a Notice of Non-Compliance with Administrative Order Number 03-01 to Attorney Keenan for failure to abide by the administrative procedures for filing, signing, and verifying pleadings and papers by electronic means. (Dkt. No. 15.) As of February 2005, however, Attorney Keenan still had not taken the steps necessary to become a

The parties did not file a joint stipulation of facts.  Rather, Hardgate set forth, *inter alia*, the following contested material facts in support of its § 523(a)(2)(B) claim: the Debtor submitted the Statement to Hardgate, or to Dean with the knowledge that it would be delivered to Hardgate, for use in connection with Hardgate's loan determination (Hardgate's Pre-Trial Statement ¶ 11); the Debtor knew that Hardgate would rely on the Statement in evaluating whether to extend credit to United (*id*. ¶ 12); and the Debtor knew that the Statement contained false and misleading information (*id*. ¶ 13).  In support of its numerous § 727(a) claims, Hardgate set forth, *inter alia*, the following contested facts: the Debtor failed to obtain, maintain, or preserve documents proving the existence of the Note Receivable (*id.* ¶ 14); the Debtor failed to keep records relating to the sale of the Troy Property (*id*. ¶ 16); the Debtor failed to keep records relating to his disposition of furniture and jewelry (*id*. ¶ 18); and the Debtor failed to keep records relating to the withdrawal of $215,000 from any financial institution (*id*. ¶ 19).

According to Hardgate, the Debtor allegedly admitted many of the contested facts during the course of his two § 341 meetings.[6]  The Debtor, of course, disputes this.  Hardgate's alleged proof included a recording of the Debtor's § 341 meetings held on July 29, 2003 and April 20, 2004 (the "Audio Tape") (Pl.'s Ex. I), but the Audio Tape was never admitted or offered into evidence.

registered electronic case filing (ECF) user in this court.  (2/14/05 Tr. at 4–5, Dkt. No. 32.)  During opening remarks the first day of trial on February 14, 2005, Attorney Keenan explained that he had tried to file the pretrial statement in person at 4:40 P.M. on February 4, 2005.  The statement was in fact dated February 4, 2005, but the Clerk's Office closed at 4 P.M.  Despite his receipt of the prior notice of noncompliance, he mistakenly believed that registration for electronic filing with the District Court would be sufficient here.  Having heard this explanation and having determined that no prejudice would accrue to the Debtor if Hardgate were allowed to proceed, the court admonished Attorney Keenan for the late filing and proceeded with the trial.

[6] Hardgate also contends that the Debtor admitted the challenged facts during a 2004 examination conducted on October 24, 2003 (*see* Pl.'s Objection to Def.'s Proposed Exhibits, Dkt. No. 24), but Hardgate did not produce a transcript of that examination.  Even if the Debtor's prior testimony were relevant to this proceeding, however, Hardgate would not have had the opportunity to question the Debtor with respect to the same.  *See infra* note 9.

Following the court's February 14, 2005 colloquy with Attorney Keenan regarding the foundational criteria for admission of the Audio Tape, Attorney Keenan moved for clarification of the court's preliminary evidentiary rulings and for an order pursuant to § 105 granting Hardgate leave to amend its pretrial statement to add authenticating witnesses.  (*See* Mar. 30, 2005 Affirmation of John J. Keenan, III, Esq. ("Keenan Affirmation"), Dkt. No. 28.)  On April 6, 2005, the court issued an oral ruling denying Hardgate's request to admit the Audio Tape for lack of a proper foundation.[7]

Lastly, throughout the course of this proceeding, Attorney Keenan advised the Debtor's counsel and the court that Attorney Mayer's testimony was necessary to the prosecution of Hardgate's § 523(a)(2)(B) claim because Hardgate no longer employed any individuals who had firsthand knowledge of the American Glove Transaction.  Attorney Mayer, therefore, was expected to offer facts about the formative negotiations leading to the deal.  As the subpoena suggests, however, Attorney Mayer was not a willing participant to this proceeding since he was concerned about his ethical obligations to his former client, who was not present in the courtroom to speak to the issue of attorney-client privilege.  Yet Attorney Keenan refused to waive the attorney-client privilege on behalf of his client or to acquiesce that an implied waiver would occur once Hardgate placed its former counsel on the witness stand; instead, Attorney Keenan insisted that the privilege would remain in place so long as Attorney Mayer's testimony was limited to business, not legal, advice rendered to Hardgate during the course of his representation.  After oral argument by Attorneys Keenan and Siegel, the court leapt that procedural hurdle, but not in the manner that Attorney Keenan had hoped for.[8]  Though the court allowed Attorney Mayer's testimony, it reserved

---

[7] *See* Discussion *infra* Part I.

[8] *See* Discussion *infra* Part II.

12

decision on the limited question of attorney's fees and costs generated in connection with his appearance.

The trial began on February 14, 2003, and the court heard the testimony of five witnesses: Michael Gagnon ("Gagnon"), a subpoenaed witness, accountant, and business and financial consultant who had prepared tax returns for the Debtor and assisted the Debtor with the American Glove Transaction (02/14/05 Tr. at 45–46); Eakin; Mantello; Callucci; and Attorney Mayer.  During continuance of the trial on April 13, 2005, Attorney Keenan resumed his direct examination of Attorney Mayer, and Hardgate called two additional witnesses: Lorne Katz ("Katz"), an accountant and member of the Certified General Accountants Association of Ontario, Canada (04/13/05 Tr. at 70), who had been retained by Hardgate in April 2002 to perform certain services in connection with the operation and sale of American Glove (*id.* at 73); and Smith.  Much to the dissatisfaction of Attorney Keenan, the court did not hear from the Debtor.[9]

Gagnon shed some light on the Debtor's involvement with Dean and United; he was the one who introduced the Debtor to Dean (2/14/05 Tr. at 56).  In 2000 or 2001, he prepared the Debtor's personal tax return and tax documents for the Debtor's corporation, and he assisted the Debtor with the liquidation of funds that were to be transferred over to United.  (*Id.* at 46.)  He testified that United had asked the Debtor to lend or invest money, which the Debtor agreed to and obtained from

---

[9] For the convenience of the parties and the witnesses appearing in this proceeding, the witnesses were called out of order.  The Debtor voluntarily appeared on February 14, 2005, but he was not called upon to testify; he did not appear at the continuation of the trial on April 13, 2005.  At that time, Attorney Keenan stated that he did not subpoena the Debtor because it was his understanding that the court had directed the Debtor's appearance on that date.  (4/13/05 Tr. at 145.)  Notwithstanding that Hardgate should have issued the subpoena prior to the initial trial date, the court reviewed the record and found that it had simply closed the record with the exception of two potential witnesses, to wit, the Debtor and Attorney Mayer.  According to Hardgate's pretrial statement, Attorney Keenan anticipated calling the Debtor as part of Hardgate's case in chief; accordingly, failure to subpoena the Debtor was a tactical error on his part.  Thus, any perceived prejudice that may have resulted to Hardgate as a result of the Debtor's absence at trial on April 13, 2005 was clearly self-inflicted.

his stocks and IRA's. (*Id.*) Gagnon believed the Debtor invested approximately $215,000 in United, but the Debtor never saw a return on the investment. (*Id.* at 53–54.) Gagnon further testified that the Note Receivable referenced on the Statement correlated to the Debtor's $215,000 investment in United. (*Id.* at 58–61, 65–66.)

As a whole, however, the witnesses' testimony left the court with more questions than answers; notwithstanding two days of trial, the details of the Debtor's financial history, the sale of the Troy Property, and his involvement in the American Glove Transaction are still unclear. For example, Eakin testified that, although he was not a licensed realtor at the time of his involvement with the Debtor's sale of the Troy Property (2/14/05 Tr. at 67), his role in that transaction was to find a buyer and close the sale (*id.* at 68). The Troy Property was listed for $45,000, and it was sold to Smith under what Eakin described as an assignment of contract. (*Id.* at 69.) He testified that his corporation, Delt Enterprises ("Delt"), of which he was the sole shareholder, entered into a contract to purchase the Troy Property from the Debtor and Mantello for $45,000 (*id.* at 69, 71), but the recorded deed listed the transfer from the Debtor and Mantello to Smith (Pl.'s Ex. G). Eakin further testified that Delt never obtained title to the Troy Property (*id.* at 73), and that there was never a written assignment of the original contract from Delt to Smith (*id.* at 75).[10] According to Eakin, the purchase price was actually $81,000 (*id.* at 69),[11] but only $45,000 changed hands; $45,000 was tendered to the Debtor and Mantello, and the remainder of the purchaser's mortgage proceeds were retained for future improvements to the real estate (*id.* at 70). The fee for Eakin's services, whatever

---

[10] The record as it stands does not answer whether there was ever a written contract for the sale of the Troy Property.

[11] The court notes that the New York State Real Property Transfer Report (RP-5217) listed the full sale price as $85,000. (Pl.'s Ex. H.)

they may have been, was paid out of the mortgage proceeds obtained by Smith.  (*Id.* at 75.)

Unfortunately for Hardgate, Eakin is not the only witness whose testimony lacked fluidity or resolve.  Attorney Keenan repeatedly acknowledged that his client could not produce any employee or representative who possessed personal knowledge of the American Glove Transaction (*see* Pl.'s Answer to Mot. to Quash ¶ 5, Dkt. No. 25); therefore, he sought to prove the reliance element of Hardgate's § 523(a)(2)(B) claim through Katz's testimony.  According to Katz, on or about April 2002, Hardgate's board of directors passed a resolution "authorizing [him] to transact a sale of American Glove Corporation."  (4/13/05 Tr. at 73.)  When asked whether he had decision-making authority on behalf of Hardgate, however, Katz answered, "I believe I did, yes."  (*Id.* at 73.)  Despite Attorney Keenan's representation that "[there would] be a further offer of proof with regard to the authorization empowering [Katz] to perform certain functions for Hardgate" (*id.* at 72), that offer was never made.  Though Katz later stated that he had actual authority to act on behalf of Hardgate (*id.* at 75), Attorney Keenan conceded that Hardgate's failure to produce the resolution would affect the weight to be given to Katz's testimony (*id.* at 74).

Katz testified that he was a signatory to the Stock Purchase Agreement between Hardgate and United (*id.* at 79), and that he had been intimately involved in the negotiation and completion of the sale.  Because Katz had concerns about the creditworthiness of Dean (*id.* at 81), he asked Dean to obtain guarantors for the American Glove Transaction.  Dean solicited the Debtor and Callucci, and Katz apparently relied on their personal financial statements when he recommended to Hardgate that it follow through with the deal.  (*Id.* at 86–87.)  According to Katz, he placed greater reliance on Gardner's Statement than on Callucci's because Gardner's net worth was significantly higher than Callucci's.  (*Id.* at 87.)  But he saw the Statement for the first time at the

15

offices of American Glove "shortly before the actual closing took place" (*id.* at 89); Katz surmised that the "short time span" he referred to could have been as short as one week, or one or two days, before the deal closed.  In fact, further testimony pointed towards one day; the Statement was dated June 6, 2002 (Pl.'s Ex. D), and the stock purchase closing took place on June 7, 2002 (*id.* at 104). Given the close proximity of his receipt of the Statement and the closing, Katz testified that he did not perform the required due diligence with respect to the Statement by verifying its critical numbers.  (*Id.* at 102.)

Despite Attorney Keenan's insistence that the court also hear from Attorney Mayer, his testimony did nothing to bolster Hardgate's case.  Over the objection of the Debtor's counsel, Attorney Mayer testified that he prepared the Note and personal guarantees of the Debtor, Dean, and Callucci as part of the American Glove Transaction (*id.* at 15), and that he personally reviewed the Statement (*id.* at 26).  Further, he testified that, at the time of the American Glove Transaction, he believed that Hardgate needed to obtain assurances beyond those of Dean.  (*Id.* at 27.)  But, like Katz, he did not recall having reviewed the Statement until the day before the closing occurred.  (*Id.* at 56.)  Further, he did not know whether anyone from Hardgate had looked at the Statement prior to the closing date.  (*Id.* at 59.)

After having given Attorney Keenan an opportunity to review the record developed on February 14, 2005 to resolve any doubts about the Debtor's appearance, or lack thereof, at the continuation of trial on April 13, 2005, the court heard closing arguments.  With the exception of correspondence filed by Attorneys Siegel and Keenan to address the limited issue of sanctions in the form of a witness's attorney's fees and costs, the parties did not file post-trial submissions.

**ARGUMENTS**

16

With respect to Attorney Keenan's summation, several observations bear mentioning. First, Attorney Keenan acknowledged that much of Hardgate's alleged proof did not make its way into the record. Second, he tacitly agreed that Hardgate's case rises or falls on facts that the court cannot consider. Lastly, perhaps for these reasons, Attorney Keenan's summation was somewhat erratic and difficult to follow.

Beginning with Hardgate's § 523(a)(2)(B) claim, Attorney Keenan argued that the value of the Troy Property on the Statement was significantly greater than its sale price despite there having been only two weeks between Hardgate's receipt of the Statement and the transfer of the Troy Property, and he took issue with the Debtor's failure to notify Hardgate of the pending sale. Moreover, he argued that there is at least $20,000 in equity "missing," since the Debtor's petition listed the value of the Troy Property as $80,000, but the Debtor and Mantello purport to have received only $45,000 from the sale. Finally, he asked the court to consider that the Debtor listed approximately $18,000 in antiques and jewelry on his Statement in 2002, but none on his petition in 2003; in his opinion, this raises suspicions about the Debtor's veracity.

Turning briefly to Hardgate's § 727 causes of action, Attorney Keenan implied that the documents offered into evidence speak for themselves; therefore, the Debtor's fraudulent intent should be inferred from the record. Attorney Keenan repeatedly referenced the Debtor's failure to testify "in his own defense," thereby implying that the burden had shifted from Hardgate to the Debtor. Though he did not specifically address each subsection of § 727, he did state that subsection (a)(4) was only "a side issue" in the case.

The Debtor's counsel, citing and relying upon established case law,[12] argues that Hardgate

---

[12] In particular, the Debtor's counsel cites *In re Kirch*, Ch. 7 Case No. 03-16670, Adv. No. 04-90065, slip. op. (Bankr. N.D.N.Y. July 27, 2004); *In re Drake*, Ch. 7 Case No. 01-14993, Adv. Nos. 02-

has not satisfied its burden of proof with respect to any of the four causes of action.  For this reason,

he asks that the Complaint be summarily denied.

## DISCUSSION

To ensure that only honest debtors enjoy the privilege of a fresh start, the Bankruptcy Code

provides that certain debts are excepted from discharge, *see* 11 U.S.C. § 523(a)(2), (4), and (6), and

that a debtor may be denied a discharge from all of his or her debts under specific and well defined

circumstances, *see* 11 U.S.C. § 727(a)(2)–(7).  In assessing dischargeability of a particular debt,

§ 523 must be strictly construed against the objecting creditor and liberally in favor of the debtor.

*E.g., Bodenstein*, 168 B.R. at 26 (citing cases).  Similarly, objections to discharge under § 727 must

be literally and strictly construed against the creditor and liberally in favor of the debtor.  *E.g., id.*

(citing cases).

The burden is on the plaintiff to sustain a cause of action under either § 523 or § 727 by a

preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279 (1991).  Although the burden of

proof or persuasion must be borne by the plaintiff, FED. R. BANKR. P. 4005, "once sufficient

evidence is presented by the plaintiff to satisfy the burden of going forward with evidence, the

burden thereafter shifts to the debtor to provide evidence to rebut the plaintiff's *prima facie* case."

*Bodenstein*, 168 B.R. at 28.  The plaintiff, however, must bear the ultimate burden of proof or

persuasion by establishing each essential element of the statute by a preponderance of the evidence.

*Id.*

---

90054 and 02-90281, slip. op. (Bankr. N.D.N.Y. Feb. 18, 2004), *aff'd*, Civ. No. 5:04-cv-00735, slip. op.
(N.D.N.Y. Dec. 16, 2004), *and appeal filed*, No. 05-0654-bk (2d Cir. Jan. 13, 2005)*; In re Natalie*, Ch. 7
Case No. 99-16195, Adv. No. 01-90027, slip. op. (Bankr. N.D.N.Y. Jan. 1, 2003), *aff'd*, Civ. No. 1:03-
cv-00388 (N.D.N.Y. Aug. 19, 2003), *and appeal filed*, No. 03-5069-bk (2d Cir. Aug. 29, 2003); *In re
Wykes*, Ch. 7 Case No. 98-17405, Adv. No. 99-91179, slip. op. (Bankr. N.D.N.Y. Nov. 6, 2000); and
*First Am. Bank of New York v. Bodenstein* (*In re Bodenstein*), 168 B.R. 23 (Bankr. E.D.N.Y. 1994).

## I.  Evidentiary Ruling I–The Audio Tape

Because the lawyering in this case inadvertently excused the Debtor from having to testify

and, thus, the Audio Tape was never introduced, the court's exclusionary ruling appears to have

been unnecessary.  Though any discussion regarding its admissibility now seems academic since it

is of no bearing on this decision, the court will nonetheless undertake the exercise for the sole

purpose of clarifying the record.

Assuming *arguendo* that the Audio Tape held some probative value for Hardgate, Attorney

Keenan needed to provide evidence sufficient to meet the foundational criteria, including proof of

its accuracy and identification of the speakers, for authentication.  *See* FED. R. EVID. 901.  In its

pretrial statement, Hardgate did not list any potential witness who (1) had personal knowledge of

the Audio Tape's contents, (2) could identify the voices heard on the Audio Tape, or (3) could

describe the process used to produce the Audio Tape.  *See* FED. R. EVID. 901(b)(1), (5), and (9).

Two witnesses, namely Ms. Celli and Mr. Harris, could have authenticated the Audio Tape if their

testimony had been anticipated and they had been disclosed by Hardgate.

Attorney Keenan maintains the position that authentication is not at issue (*see* Keenan

Affirmation ¶ 11),[13] but he nonetheless sought to amend his pretrial statement to include a

---

[13] Attorney Keenan believes that the Audio Tape should have been admitted pursuant to either
Federal Rule of Evidence 801(d)(1) or (2) as a prior sworn statement by a witness or an admission by a
party-opponent, respectively.  (*See* Keenan Affirmation ¶ 11.)  In making this argument and jumping
directly to Rule 801, Attorney Keenan has put the proverbial cart before the horse; his focus on the
hearsay exceptions indicates that he has assumed too much.  A series of events would have had to occur
for Rule 801 to have applied; for example, the Debtor would have had to testify at trial; the Audio Tape
would have needed to have been introduced and admitted into evidence; and, Attorney O'Connor would
have had to make a hearsay objection to the statement or statements contained on the Audio Tape when
offered.  Though it hardly bears repeating, none of these things materialized.  Moreover, as Attorney
O'Connor correctly points out, "whether the debtor speculated or perhaps guessed that the Plaintiff relied
upon certain financial information, that so-called admission is irrelevant as it is the *Plaintiff* that must
testify with regard to [its] reliance."  (4/4/05 Affirmation in Resp. of Michael J. O'Connor, Esq. ¶ 16, Dkt.
No. 30.)  Unfortunately, as is apparent from Attorney Keenan's trial strategy, this simple truth seems to

representative of the Office of the United States Trustee ("UST") as an authenticating witness.  He

also produced the transmittal letter sent to him by the UST with the Audio Tape enclosed, but even

if that had been timely identified as a proffered exhibit, the court notes that it does not answer the

above questions or those related to the chain of title.  In short, Attorney Keenan would have needed

to do more than produce a representative of the UST to overcome the Debtor's evidentiary objection

to the Audio Tape.

## II.  Evidentiary Ruling II–The Order to Show Cause

Attorney Keenan's trial strategy in this case was illogical; the court remains perplexed by

Attorney Keenan's choice to call Hardgate's former counsel, whether it was to elicit substantive

testimony proving elements of Hardgate's § 523(a)(2)(B) cause of action, or to make an adequate

offer of proof for certain proffered exhibits; as discussed *infra*, both explanations were given by

Attorney Keenan at various stages of this proceeding.  Testimony given for either purpose, however,

should have come directly from a representative of Hardgate, or from those individuals who signed

the documents in question.  Because it did not, the court must now address the unintended

consequences of Attorney Keenan's choice–the request by Attorney Mayer for attorney's fees and

lost earnings made pursuant to Federal Rule of Civil Procedure 45(c)(1).[14]

On February 7, 2005, Attorney Keenan personally served Attorney Mayer with a subpoena

---

have evaded him in his relentless pursuit of the Debtor.

[14] (c) Protection of Persons Subject to Subpoenas.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
FED. R. CIV. P. 45(c)(1).

to appear at the trial in this proceeding scheduled for February 14, 2005. (Dkt. No. 19.)  After

providing Attorney Keenan with an opportunity to withdraw the subpoena (*see* Feb. 8, 2005 Aff. of

Frank C. Mayer ¶ 6, Dkt. No. 21), Attorney Siegel moved on behalf of his client to quash the

subpoena pursuant to Federal Rule of Civil Procedure 45(c)(3)(A)(I), (iii), and (iv).[15]

The parties expended considerable time and effort debating the implications of the attorney-

client privilege under the unique circumstances presented here.  *See* EDNA SELAN EPSTEIN, THE

ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 271 (A.B.A. SEC. LIT., 4th ed.

2001) ("Rarely would counsel dispute which past or current counsel has the authority to assert or

to waive the privilege on behalf of a client.  Yet, as is always the case in the law, sooner or later the

rare occurs.").  To summarize, Attorney Siegel argued that Attorney Mayer could not testify, even

under the power of a subpoena, absent an express waiver of the attorney-client privilege by

Hardgate, while Attorney Keenan argued that waiver–express or implied–was unnecessary because

he could tailor his questions so as to avoid disclosure of privileged communications.  Because this

limited point was previously decided by oral ruling issued February 14, 2005, the court sees no need

to rehash the parties arguments in any further detail.  The answer to whether the attorney-client

privilege attached to Attorney Mayer's testimony is a simple one.

---

[15] The statute provides, in relevant part:
(3)(A) On timely motion, the court by which a subpoena was issued shall quash or
modify the subpoena if it
  (i) fails to allow reasonable time for compliance;
. . . .
  (iii) requires disclosure of privileged or other protected matter and no exception or
waiver applies, or
  (iv) subjects a person to undue burden.
FED. R. CIV. P. 45(c)(3)(A).  Attorneys Siegel and Mayer presented no argument with respect to the length
of time for compliance; the court, therefore, deems this issue waived.

> When an attorney is called as an expert or, for that matter, even when a lawyer is
> called as a fact witness under certain circumstances, any privilege that might
> otherwise attach to the communications between the party calling that attorney as a
> witness and the attorney is deemed placed into issue and waived.

*Id.* at 373.  *See also Herrick Co. v. Vetta Sports, Inc.*, No. 94 Civ. 0905, 1998 WL 637468 (S.D.N.Y.

Sept. 17, 1998), at *1 ("a party waives the attorney-client and work-product privileges whenever it

puts an attorney's opinion into issue, by calling the attorney as an expert witness or otherwise")

(collecting cases).  Thus, the court ruled that an implied waiver occurred the moment Attorney

Keenan called Attorney Mayer to the stand.

Considering the posture of this case, the court believes that the appropriate grievance is that

of undue burden.  In his post-trial letter brief (Dkt. No. 34), Attorney Siegel argues that it was

unduly burdensome to Attorney Mayer to require his attendance at trial when he had no personal

knowledge of matters in dispute, i.e., the accuracy of the Statement or Hardgate's reliance thereon.

"The essential point [of the motion to quash], was that Attorney Mayer could in no way be a

substitute for Mr. Keenan's client."  (*Id.* at 2.)  According to Attorney Siegel, "as Mr. Mayer's

testimony unfolded, it became glaring [sic] apparent . . . that Mr. Mayer's testimony was irreverent

[sic] to the issues in the case and, at best, cumulative of testimony which Mr. Katz was more than

capable of providing as an actual signatory to the Stock Purchase Agreement."  (*Id.*)  Based on

Attorney Keenan's line of questioning, Attorney Siegel contends that Attorney Keenan's use of the

court's subpoena power in this case was an improper attempt to "patch together a case."  (*Id.* at 3.)

As such, Attorney Mayer requests payment of $300 for each court appearance, or $2,700, for

attorney's fees and lost earnings resulting from his appearances in this case.[16]

---

[16] Attorney Siegel has appeared on six separate occasions with respect to Attorney Keenan's
issuance of the subpoena.  Attorney Mayer has appeared on three occasions, twice to testify, and once for
a judicial conference.  Attorney Siegel's customary rate is $260/hour, and Attorney Mayer's is $200/hour.

Attorney Keenan opposes such relief on the basis that "each and every appearance, with the exception of Mr. Mayer's one-hour testimony . . . was occasioned solely as a result of Attorney Siegel's frivolous interposition of the attorney-client privilege." (May 19, 2005 Letter of John T. Keenan, III, Esq. at 3, Dkt. No. 35.) Therefore, he asserts that Attorney Mayer is entitled to no more than the statutory witness fee.[17] (*Id.* at 4.)

After reviewing the record in its entirety, the court agrees with Attorney Siegel; there clearly was a burden associated with Attorney Mayer's testimony, but no benefit. With all due respect to Attorney Mayer, the court agrees that his testimony provided nothing of value to Hardgate's case in chief. The court is guided by the advisory committee's note to the 1991 amendment of Federal Rule of Civil Procedure 45, which reads: "Illustratively, it might be unduly burdensome to compel an adversary to attend trial as a witness if the adversary is known to have no personal knowledge of matters in dispute . . . ." FED. R. CIV. P. 45 advisory committee's note (subdivision (c) (1991). Such is the case here.

Throughout this proceeding, Attorney Keenan vacillated between putting Attorney Mayer on the stand for purposes of (1) authenticating certain documents and testifying to background facts about the American Glove Transaction (4/13/05 Tr. at 9), or (2) testifying to facts substantiating

---

Thus, their combined witness and attorney's fees amount to more than $5,000. To avoid further litigation about the reasonableness of hourly rates or time spent, Attorney Mayer requests that he and Mr. Siegel be awarded a lump sum of $2,700 for the burden placed upon them and their firm, Bond, Schoeneck & King, PLLC.

[17] A witness in attendance at any court in the United States shall be paid fees and allowances as provided by 28 U.S.C. § 1821. The statute reads in relevant part:

> A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

28 U.S.C. § 1821(b).

Hardgate's alleged reliance on the Statement.  Attorney Keenan's motive for subpoenaing Attorney

Mayer is, however, unveiled in both Hardgate's pretrial statement and in his post-trial letter

submission of May 19, 2005.  The pretrial statement reads: "Attorney Mayer may be called upon

to testify to the plaintiff's stock transaction, receipt of the defendant's . . . Statement *and the reliance*

*on the information contained therein by Hardgate when evaluating whether or not to extend credit*

*to United . . . .*"  (Hardgate's Pre-Trial Statement ¶ 22) (emphasis supplied.)  Attorney Keenan did

proceed with this line of questioning at trial, but he met with vigorous opposition from both

Attorneys Siegel and O'Connor because any answer rendered by Attorney Mayer to questions of

Hardgate's reliance would have constituted inadmissible hearsay.

When asked directly to explain the relevancy of Attorney Mayer's testimony, Attorney

Keenan abandoned his earlier position that he required Attorney Mayer's testimony for purposes of

introducing and admitting certain exhibits, and he instead replied, "*His* reliance is relevant here."

(4/13/05 Tr. at 8–9.)  This sentiment is again set forth in his post-trial letter submission.  Attorney

Keenan's justification, however, is tenuous at best; it does not necessarily follow that if Attorney

Mayer relied upon the Statement in providing advice to Hardgate, then Hardgate must also have

relied upon the Statement when it completed the American Glove Transaction.  The attorney-client

relationship is based upon sound advice, not blind faith; thus, absent testimony from an officer or

representative of Hardgate, the question of Hardgate's reliance on the Statement, if any, remains

unanswered.

There was no need for Attorney Mayer's testimony; he is a non-party to the proceeding, and

the information sought was not relevant and material to the allegations and claims at issue.  Attorney

Keenan's disguised attempt to use hearsay evidence to establish Hardgate's reliance, which is the

cornerstone of a § 523(a)(2)(B) claim, proved to be futile.  Rather than benefit Hardgate's case, the subpoena caused delay and, ultimately, the battle that ensued over its issuance exhausted the patience of this court and all parties involved.  Accordingly, the imposition of sanctions is warranted, jointly and severally, against Attorney Keenan and his client.

Taking into consideration the acceptable hourly rates of Attorneys Siegel and Mayer, the court believes that the lump sum payment of $2,700 is reasonable to compensate Attorney Mayer for attorney's fees and lost wages.  By requesting a flat fee of $300 per court appearance, thereby omitting the time spent preparing the Order to Show Cause, supporting documentation, and all further submissions of record, Attorney Mayer has voluntarily, significantly reduced the liability that may have otherwise been imposed pursuant to Federal Rule of Civil Procedure 45(c)(1).  On that basis, the Order to Show Cause is granted in part to impose sanctions in the amount requested.

## III.  Hardgate's Causes of Action

### A.  First Claim for Relief–11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2)(B) bars discharge from debts incurred by use of a false written statement concerning a debtor's financial condition.  It provides that, among other debts, an extension of credit obtained by "use of a statement in writing" is not dischargeable, if the statement (1) is materially false, (2) concerns the debtor's financial condition, (3) is relied upon by the creditor to whom the debtor is liable for the extension of credit, and (4) is made or published by the debtor "with intent to deceive."  11 U.S.C. § 523(a)(2)(B).

To satisfy the first element, a statement must be materially false so as to paint "a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit."  *Bethpage Fed. Credit Union v. Furio (In*

25

*re Furio)*, 77 F.3d 622, 625 (2d Cir. 1996) (quoting *Borg Warner Cent. Envtl. Sys., Inc. v. Nance (In re Nance)*, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987)); *see also In re Wong*, 291 B.R. 266, 274–75 (Bankr. S.D.N.Y. 2003) (court must examine whether the lender would have made the loan had he known of the debtor's true financial condition); *Bodenstein*, 168 B.R. at 28–29 (section "connotes more than merely an untrue or erroneous statement").  Importantly, the creditor must not only prove that the debt was obtained by a false statement, but also that the creditor reasonably relied on the misstatement.  11 U.S.C. § 523(a)(2)(B)(iii); *see also Field v. Mans*, 516 U.S. 59, 74–75 (1995) (comparing justifiable reliance standard of § 523(a)(2)(A) with reasonable reliance standard of § 523(a)(2)(B)).  In evaluating whether a creditor's reliance was reasonable, the court may look to the following factors:

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices);
> (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by the debtor); and
> (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Wong*, 291 B.R. at 275.

Here, the court wastes no time in striking down Hardgate's § 523(a)(2)(B) claim.  This case is unique because the personal guarantees were given by individuals who were not parties to or, excepting Dean, officers of a party to the main deal; it was not the Debtor who obtained credit from Hardgate in connection with the American Glove Transaction.  Thus, Hardgate must prove that the

Debtor fraudulently induced it to loan the funds to United, a task far more daunting than if Hardgate had loaned the funds directly to the Debtor. While all elements are in dispute, Hardgate's alleged reliance on the Statement has taken center stage.

The only witness produced by Hardgate at trial who arguably could address the issue of reliance was Katz; despite his testimony, the court is unable to make findings of actual and reasonable reliance. It is unclear whether any of Hardgate's officers, including Nihon, ever laid eyes on the Statement; therefore, the Statement could not have been a contributory cause of Hardgate's extension of credit to United.

Although the court found Katz to be a credible witness, due to the deficiencies in the record, the court questions his authority to act on behalf of Hardgate. Even if Katz had such authority, however, he admittedly did not possess or review the Statement until days before the closing and, once in his possession, he took the Statement at face value without questioning the Debtor about its accuracy. Despite his reservations about Dean's financial condition, Katz trusted Dean to obtain the guarantors and, once done, he made no attempt to verify whether their financial conditions were in fact superior to Dean's. A cursory glance at their handwritten financial statements and their credit reports one day before or the morning of the closing does not pass muster under the applicable law.

At a minimum, Katz should have inquired into the nature of the Debtor's computer consulting business, Global Business Holding LLC ("Global Business"), which the Debtor listed on the Statement under "Business Name of Applicant/Borrower," or into the nature or itemization of the Note Receivable. (Pl.'s Ex. D.) The viability of Global Business should have been a critical consideration when evaluating not only the Debtor's net worth, but also the net worth of Callucci considering that Callucci had invested $40,000 in the business. (Pl.'s Ex. C.) Moreover, had Katz

27

done some probing, he would have discovered that the Note Receivable was not evidence of an indebtedness due, but rather the Debtor's investment in United. Katz's actions amount to nothing more than blind reliance and, as such, they were patently unreasonable. A creditor "cannot assume the position of an ostrich with its head buried, ignoring obvious questions, and yet claim that it reasonably relied on these entries." *Bodenstein*, 168 B.R. at 31.

Since Katz was affiliated with Hardgate only for the American Glove Transaction, the court does not know what Hardgate's standard business practices are for evaluating credit-worthiness. The court is, however, certain that no good faith argument of reasonable reliance can be made by Hardgate under the circumstances. Moreover, even if Hardgate could make a case for reasonable reliance, Attorney Keenan's acknowledgment of the Debtor's guarantee, for which the Statement was rendered, as a "last-minute thing" undercuts any suggestion of actual reliance on the part of his client.

Based on the foregoing, the court concludes that Hardgate did not actually or reasonably rely on the Statement as required to except the judgment debt from discharge. *See* 11 U.S.C. § 523(a)(2)(B)(iii). Because the factual determination that Hardgate's reliance was not reasonable is, standing alone, sufficient to warrant denial of Hardgate's § 523(a)(2)(B) claim, any further inquiry into the other elements of § 523(a)(2)(B) is not necessary.

**B.  Second, Third, and Fourth Claims for Relief–11 U.S.C. § 727(a)(3)–(5)**

Though Hardgate addressed § 727 in its pretrial statement, Attorney Keenan focused exclusively on Hardgate's § 523(a)(2)(B) claim at trial. Excepting closing arguments, the court heard no mention of § 727, either by statutory or general reference to the elements of any of the alleged § 727(a) causes of action. Presumably, this is because Attorney Keenan mistakenly believed

28

that the burden somehow shifted to the Debtor to "explain away" the § 727(a)(3)–(5) allegations.

The burden of production does not shift to the debtor, however, until the plaintiff has produced

persuasive evidence to make out a *prima facie* case.  Thus, without the initial offer of proof from

Hardgate on any of its § 727(a) claims, the Complaint deserves no additional consideration.

## CONCLUSION

After countless hours spent on this case, the court rests upon two general conclusions: (1)

Hardgate is not a defrauded creditor whose Judgment should be preserved from discharge; and (2)

the Debtor, after being stripped of his life's savings by virtue of his involvement in the American

Glove Transaction, is deserving of a completely unencumbered new beginning, or so-called "fresh

start," *Grogan*, 498 U.S. at 286–87 (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

For all of the above reasons, the Complaint is denied in its entirety.  The portion of the Order

to Show Cause for a sanction of attorney's fees and lost wages is granted in the amount of $2,700,

and Attorney Keenan and/or Hardgate shall, within thirty days of the date of this decision, pay to

Attorney Mayer the sum of $2,700.

It is so ORDERED.

Dated: September 7, 2005
Albany, New York

/s/ Robert E. Littlefield, Jr.
Hon. Robert E. Littlefield, Jr.
United States Bankruptcy Judge